UNITED STATES DISTRICT COURT
SOUTHERN DISTRCIT OF FLORIDA

Case No.



SECURITIES AND EXCHANGE COMMISSION,        )
                                            )
                    Plaintiff,              )
                                            )
v.                                          )
                                            )
OSVALDO PITTERS, TERRELL J. KUYKENDALL,    )
and STEVEN M. IVESTER,                      )
                                            )
                    Defendants.             )
_____ )

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiff Securities and Exchange Commission alleges:

**I. INTRODUCTION**

1.      Between November 2004 and May 2005, Osvaldo Pitters and Terrell J.
Kuykendall recorded almost $1,400,000 in fictitious revenues from purported computer
hardware sales and management services on the financial statements of VoIP, Inc., a
small, publicly-traded Internet telecommunications company.   They recorded the
fictitious sales and services because VoIP's overall revenue was falling short of the
company's projections for 2004 and 2005.   By recording the false revenue, Pitters and
Kuykendall were able to inflate the revenue VoIP reported, for the third quarter and year
end 2004, and for the first quarter of 2005, by as much as 47%.

2.      Steven M. Ivester, VoIP's Chief Executive Officer, knew VoIP was
struggling financially and that the company's actual revenues were substantially less than
its projections.   Nonetheless, he did not question the suspiciously high revenues that

Pitters and Kuykendall recorded on VoIP's financial statements. In addition, between November 2004 and March 2006, the month VoIP disclosed it had overstated its revenues, Ivester realized up to $5.2 million in proceeds from selling more than 3.7 million shares of VoIP stock into the market.

3.      By engaging in this conduct, Pitters and Kuykendall violated the antifraud provisions of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), and the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and 17 C.F.R. 240.10b-5, and Ivester violated Sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2) and (3). Pitters and Kuykendall also aided and abetted VoIP's violation of the books and records and internal control provisions of the Exchange Act, 15 U.S.C. §§ 78m(a), 78m(b)(2)(A), 78m(b)(2)(B), and 78m(b)(5), 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13, 240.13b2-1, and 240.13b2-2. In addition, Ivester and Pitters violated the officer certification provisions of the Exchange Act, 17 CF.R. § 240.13a-14, and Ivester violated the beneficial ownership reporting provisions of the Exchange Act, 15 U.S.C. § 78p(a) and 17 CF.R. § 240.16a-3.

## II. DEFENDANTS

4.      Pitters, 50, is a resident of Plantation, Florida. Pitters served as VoIP's Chief Financial Officer from May 2004 to October 2005 and its Vice President of Finance from November 2005 to March 2006. He resigned his position as Vice President of Finance in March 2006, after VoIP's new management discovered the fictitious revenue.

5.      Kuykendall, 57, is a resident of Tampa, Florida. From June 2004 to April 2006, VoIP employed Kuykendall as the General Manager of its subsidiary, VCG

2

Technologies, Inc. d/b/a DTNet Technologies, Inc. ("DTNet").    VoIP terminated Kuykendall in April 2006 for recording the fictitious revenue.

6.    Ivester, 44, is a resident of Weston, Florida.   Ivester served as VoIP's Chief Executive Officer, President, and Chairman of its Board of Directors from April 2004 to October 2005.   In October 2005, Ivester resigned his positions as CEO and President, and in December 2005 he resigned as Chairman.

### III. JURISDICTION AND VENUE

7.    The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a), and Sections 21(d), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78(u)(e), and 78aa.

8.    The Court has personal jurisdiction over Defendants and venue is proper in the Southern District of Florida.   Between April 2004 and March 2006, VoIP's corporate headquarters were located in the Southern District of Florida, and Defendants engaged in acts and transactions in the Southern District of Florida that constitute the violations set forth in this Complaint.

9.    Defendants, directly or indirectly, made use of the means or instruments of interstate commerce, or the means or instruments of transportation and communication in interstate commerce and the mails in connection with the acts, practices, and courses of business set forth in this Complaint.

## IV.  FACTUAL ALLEGATIONS

**A.**     **VoIP's Reporting Obligations**

10.     Beginning in April 2004 and continuing through March 2006, VoIP was engaged in the business of developing, marketing, and selling voice-over-Internet and other telecommunication services and products.  VoIP's principal offices were located in Fort Lauderdale, Florida and it employed approximately thirty-five individuals.

11.     During this time period, VoIP's common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act, 15 U.S.C. § 78l(g), and was quoted on the OTC Bulletin Board under the symbol VOII.

12.     As an issuer of registered securities, VoIP was required to furnish the Commission with annual and quarterly reports in accordance with Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 13a-1 and 13a-13 thereunder, 17 C.F.R. §§ 240.13a-1 and 240.13a-13.

13.     Pursuant to Rule 12b-20 under the Exchange Act, 17 C.F.R. § 240.12b-20, VoIP was required to include in the annual and quarterly reports it furnished the Commission information that was necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

14.     Additionally, Regulation S-X under the Exchange Act, 17 C.F.R. §§ 1-01 et. seq., required that the financial statements VoIP furnished to the Commission its annual and quarterly reports be presented in conformity with Generally Accepted Accounting Principals ("GAAP").

**B.**   **VoIP's 2004 Sales Projections for DTNet**

15.   In June 2004, VoIP, using stock, purchased 100% of DTNet, a small, private company that sold modems and other computer hardware products.   DTNet's offices were located in Tampa, Florida and it employed approximately six individuals. VoIP purchased DTNet from several individuals, including Kuykendall, who at the time was acting as the company's bookkeeper.   Following the purchase, VoIP elevated Kuykendall to the position of General Manager of DTNet.

16.   In June and July 2004, VoIP issued and disseminated a press release and filed with the Commission a Form 8-K projecting DTNet's annual sales for 2004 would reach $7.5 million.

17.   In August 2004, VoIP filed with the Commission a quarterly report on Form 10-Q for the three months ended June 30, 2004, again projecting DTNet's annual sales for 2004 would reach $7.5 million.

**C.**   **Pitters and Kuykendall Record Fictitious DTNet Revenue in 2004**

18.   Although Pitters, along with Ivester, maintained an office in VoIP's offices in Fort Lauderdale, and Kuykendall maintained an office in DTNet's offices in Tampa, Kuykendall and Pitters communicated regularly by telephone and e-mail.

19.   Pitters prepared and compiled VoIP's consolidated financial statements. Those financial statements reflected the financial performance of VoIP and all of its subsidiaries, including its wholly owned subsidiary DTNet.

20.   Kuykendall prepared and compiled DTNet's financial reports which he forwarded to Pitters for incorporation into VoIP's consolidated financial statements.

5

21.     After it was acquired by VoIP, DTNet's sales fell because it did not have cash to purchase inventory and because of technical deficiencies with VoIP's voice-over-Internet system, among other things.  Because DTNet was not paying its vendors, the company was not obtaining any new products.

22.     As of September 30, 2004, DTNet had revenues of no more than $1.4 million, most of which it had earned prior to VoIP acquiring it in June 2004.  As of November 2004, DTNet had generated at most $400,000 since being acquired.  By no later than the fall of 2004, Pitters and Kuykendall knew that DTNet's sales for year-end 2004 would be substantially less than the $7.5 million VoIP had projected.  Kuykendall had also warned Pitters during the due diligence process prior to VoIP's purchase of DTNet that $3 million in sales was the best the company could hope to accomplish in 2004.

23.     In response to the significant shortfall between DTNet's actual and projected sales, Pitters directed Kuykendall to inflate DTNet's revenues by recording fictitious revenues on DTNet's financial reports.

24.     Between October 2004 and March 2005, Kuykendall recorded on DTNet's books and records approximately $791,200 in fictitious revenue from the purported sale of computer hardware and management services to at least six companies as of December 31, 2004.  Five of these companies were controlled by the former majority owner of DTNet, and the sixth company was controlled by a friend of Kuykendall's.  In addition, Kuykendall performed bookkeeping services for some or all of these companies.

25.     Although this fictitious revenue was not nearly enough to meet VoIP's previous sales projections for DTNet in 2004, it did have the effect of falsely inflating

VoIP's overall revenue figures by 47% for the third quarter of 2004 and by 43% for the year ended December 31, 2004.

**D.    Pitters and Kuykendall Report Fictitious DTNet Sales Again in 2005**

26.    In November 2004, VoIP filed a quarterly report on Form 10-Q for the three months ended September 30, 2004, projecting DTNet's annual sales for 2005 would again reach $7.5 million.

27.    Already by March 2005, Pitters and Kuykendall knew, based on the sales to date and continuing problems, that DTNet was not likely to meet VoIP's sales projections for 2005, just as it had failed to do so in 2004.

28.    Pitters again directed Kuykendall to inflate DTNet's performance by recording fictitious revenue on DTNet's financial reports.

29    Between March and May 2005, Kuykendall recorded approximately $605,317 in fictitious revenue from the sale of computer hardware and management services to the same six related companies as of March 31, 2005.

30.    This fictitious revenue had the effect of inflating VoIP's overall revenue by 43% for the first quarter of 2005.

**E.    Pitters and Kuykendall Cause VoIP to Materially
Overstate Its Consolidated Revenues For 2004 and 2005**

31.    After Kuykendall recorded the fictitious revenues on DTNet's financial statements, Pitters incorporated them in VoIP's consolidated financial statements, thus inflating VoIP's consolidated revenues for 2004 and the first quarter of 2005.

32.    Pitters, who prepared and compiled the reports VoIP filed with the Commission, included the inflated revenues in a Form 10-K and two Form 10-Qs VoIP furnished to the Commission for 2004 and 2005.

33.    In November 2004, VoIP filed with the Commission a quarterly report and consolidated financial statements on Form 10-Q showing consolidated revenues of $929,767 for the nine months ended September 30, 2004. In fact, VoIP's consolidated revenues through the third quarter 2004 were only $633,183, and were overstated in the report as a result of the fictitious DTNet hardware sales and management services recorded by Pitters and Kuykendall.

34.    In March 2005, VoIP filed with the Commission an annual report and consolidated financial statements on Form 10-K reflecting consolidated revenues of $2,619,393 as of the year ended December 31, 2004. In fact, VoIP's consolidated annual revenues for 2004 were only $1,828,193 and were overstated in the report as a result of the fictitious DTNet hardware sales and management services recorded by Pitters and Kuykendall.

35.    In May 2005, VoIP filed with the Commission a quarterly report and consolidated financial statements on Form 10-Q reflecting consolidated revenues of $2,007,147 as of the three months ended March 31, 2005. In fact, VoIP's consolidated revenues for the first quarter of 2005 were only $1,402,469 and were overstated in the report as a result of the fictitious DTNet hardware sales and management services recorded by Pitters and Kuykendall.

**F.    Pitters Falsely Certifies VoIP's Reports are Accurate and Provides VoIP's Independent Auditors with Falsified Financial Records**

36.    Rule 13a-14 under the Exchange Act, 17 C.F.R. § 240.13a-14, required Pitters, while serving as VoIP's CFO, to certify in writing the reports and financial statements VoIP filed with the Commission were accurate.

37.     Although he knew they reflected fictitious revenues, Pitters certified in writing the accuracy of the annual and quarterly reports VoIP filed with the Commission for the third quarter and year end 2004, and for first quarter of 2005.

38.     Pitters also provided, and directed Kuykendall and others to provide, ledgers, journals, and invoices he knew reflected fictitious revenues to VoIP's independent auditors in connection with their audit of VoIP's financial statements for the year ended December 31, 2004.  Kuykendall also provided falsified audit confirmation letters to VoIP's outside auditors.

### G.     Ivester Was or Should Have Been Aware the Revenue VoIP Reported In Its Filings Was Suspiciously High

39.     Ivester participated in drafting and reviewed the annual and quarterly reports VoIP filed with the Commission for the third quarter and year end 2004, and for first quarter of 2005.

40.     Ivester was in possession of information indicating the revenue figures contained in VoIP's filings with the Commission were suspiciously high and inaccurate.

41.     Ivester directed and supervised all of VoIP's day-to-day business operations in 2004 and 2005.  He knew VoIP was struggling financially because of technical problems with its voice-over-Internet systems that made its telecommunication services unattractive to paying users.  Ivester also knew DTNet's sales were down because of a lack of customers using VoIP's telecommunications services who might also purchase DTNet's hardware products.

42.     Ivester controlled VoIP's bank accounts and the bank accounts for VoIP's subsidiaries, including DTNet.  He also regularly reviewed bank statements for the accounts and VoIP's consolidated bank reconciliations.  Ivester therefore knew or should

9

have known the revenues DTNet was reporting were significantly higher than its cash deposits and receipts.

43.     Ivester regularly reviewed VoIP's consolidated accounts payable reports. He also authorized and directed which bills and debts VoIP and its subsidiaries paid. Ivester therefore knew DTNet was not paying its vendors and, as a consequence, was unable to purchase inventory to increase its sales.

44.     In November 2004, Ivester demonstrated his knowledge of DTNet's lagging sales in a telephone call he made to Kuykendall.   During the call, Ivester expressed his concern that DTNet had generated only between $300,000 and $400,000 in revenues since VoIP acquired the company in June 2004.  Ivester also told Kuykendall that DTNet "needed to hit $1 million in sales" by December 31, 2004, and asked him "to see what [he] could do" about making that figure.

45.     The lackluster sales of VoIP's telecommunication services, the significant difference between DTNet's reported revenues and its cash deposits and receipts, DTNet's unpaid vendor bills and limited inventory, and Ivester's telephone call to Kuykendall all suggested the revenues reflected in the reports VoIP filed with the Commission for the third quarter and year end 2004, and for first quarter of 2005 were inexplicably high and inaccurate.

46.     Nonetheless, Ivester failed to question the veracity of the suspicious revenue figures and filed or directed others to file VoIP's Form 10-Q and Form 10-K for the third quarter and year end 2004, and the Form 10-Q for the first quarter 2005. As VoIP's CEO, Ivester also certified in writing the reports were accurate.

**H.     VoIP's New Management Discovers the Overstated Revenues**

47.     In October 2005, Ivester resigned his positions as VoIP's CEO and President, and Pitters was demoted from CFO to Vice President of Finance.

48.     Between November 2005 and February 2006, VoIP's new CEO and CFO discovered the fictitious DTNet sales and revenues.

49.     In March 2006, VoIP filed a Form 8-K with the Commission publicly disclosing the overstatements in its previously reported sales and revenues.

**I.     Ivester's Undisclosed Stock Sales**

50.     Between April 2004 and November 2005, Ivester realized proceeds of approximately $4.4 million by selling more than 4 million shares of VoIP common stock into the market.

51.     Section 16(a) of the Exchange Act, 15 U.S.C. § 78p(a), and Rule 16a-3 thereunder, 17 CF.R. § 240.16a-3, require owners of more than 10% of any class of equity securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, and every officer and director of an issuer with a class of equity securities that is registered pursuant to Section 12 of the Exchange Act, to report all sales of such securities by filing a Form 4 with the Commission by the end of the second business day after each transaction.

52.     Between April 2004 and December 2005, Ivester served as an officer and director of VoIP. During the same time period, he also owned more than 10% of VoIP's outstanding common stock. Ivester was therefore required to disclose all of the stock sales he made between April 2004 and December 2005 by filing a Form 4 with the Commission within two days of each transaction. However, he never filed the required

forms until VoIP was under new management and he had resigned as an officer and director of the company. On December 30, 2005, Ivester filed multiple Forms 4 with the Commission disclosing for the first time that he had sold 4,011,089 shares of VoIP through November 2005.

53.     Between January and March 2006, the month VoIP disclosed the overstatements in its previously reported revenues, Ivester realized an additional $833,926 in proceeds from selling 490,000 more shares of VoIP common stock into the market.

## COUNT I

### Pitters and Kuykendall Violated Section 17(a)(1) of the Securities Act

54.     The Commission repeats and realleges Paragraphs 1 through 49 of this Complaint as if fully set forth herein.

55.     From at least November 2004 to March 2006, Pitters and Kuykendall, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by use of the mails, in the offer or sale of securities, as described in this Complaint, knowingly, willfully, or recklessly employed devices, schemes, or artifices to defraud.

56.     By reason of the foregoing, Pitters and Kuykendall, directly or indirectly, violated and, unless enjoined, are likely to continue to violate Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT II

### Pitters, Kuykendall, and Ivester
### Violated Sections 17(a)(2) and 17(a)(3) of the Securities Act

57.     The Commission repeats and realleges Paragraphs 1 through 49 of this Complaint as if fully set forth herein.

58.     From at least November 2004 to March 2006, Pitters, Kuykendall, and Ivester, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by the use of the mails, in the offer or sale of securities, as described in this Complaint: (a) obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (b) engaged in transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

59.     By reason of the foregoing, Pitters, Kuykendall, and Ivester, directly or indirectly, violated and, unless enjoined, are likely to continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act, 5 U.S.C. §§ 77q(a)(2) and 77q(a)(3).

## COUNT III

### Pitters and Kuykendall Violated Section 10(b) of the Exchange Act and Rule 10b-5

60.     The Commission repeats and realleges Paragraphs 1 through 49 of this Complaint as if fully set forth herein.

61.     From at least November 2004 to March 2006, Pitters and Kuykendall, directly or indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, in connection with the purchase or sale of securities, as described in this

13

Complaint, knowingly, willfully or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and courses of business which have operated or would operate as a fraud upon the purchasers of such securities.

62.     By reason of the foregoing, Pitters and Kuykendall, directly or indirectly, violated and, unless enjoined, are likely to continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

**COUNT IV**

**Pitters and Kuykendall Aided and Abetted VoIP's Violations of
Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13**

63.     The Commission repeats and realleges paragraphs 1 through 49 of this Complaint as if fully set forth herein.

64.     Between November 2004 and May 2005, VoIP filed with the Commission an annual report on Form 10-K for the year ended December 31, 2004, and quarterly reports on Forms 10-Q for the three months ended September 30, 2004, and the three months ended March 31, 2005, that each overstated VoIP's revenues by more than 40%. VoIP therefore violated Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13.

65.     By reason of the foregoing, Pitters and Kuykendall aided and abetted VoIP's violations of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules

12b-20, 13a-1, and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13.

## COUNT V

### Pitters and Kuykendall Aided and Abetted VoIP's
### Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act

66.     The Commission repeats and realleges paragraphs 1 through 49 of this Complaint as if fully set forth herein.

67.     From at least November 2004 to March 2006, VoIP failed to make and keep, books, records, and accounts, which in reasonable detail, accurately and fairly reflected the transactions and dispositions of VoIP's assets.  VoIP therefore violated Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A).

68.     From at least November 2004 to March 2006, VoIP failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (1) transactions were executed in accordance with management's general or specific authorization; (2) transactions were recorded as necessary (a) to permit preparation of financial statements in conformity with GAAP or any other criteria applicable to such statements or (b) to maintain accountability of assets; (3) access to assets was permitted only in accordance with management's general or specific authorization; or (4) the recorded accountability for assets was compared with existing assets at reasonable intervals and appropriate action was taken with respect to any differences.  VoIP therefore violated Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(B).

69.     By reason of the foregoing, Pitters and Kuykendall aided and abetted VoIP's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78m(b)(2)(A) and (B).

## COUNT VI

### Pitters and Kuykendall Violated
### Section 13(b)(5) of the Exchange Act and Rule 13b2-1

70.     The Commission repeats and realleges paragraphs 1 through 49 of this Complaint as if fully set forth herein.

71.     From at least November 2004 to March 2006, Pitters and Kuykendall knowingly circumvented VoIP's internal accounting controls or knowingly failed to implement a system of internal accounting controls for VoIP, and knowingly falsified books, records, or accounts subject to Section 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2).

72.     By reason of the foregoing, Pitters and Kuykendall violated Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and Rule 13b2-1 thereunder, 17 C.F.R. § 240.13b2-1.

## COUNT VII

### Pitters Violated Rule 13b2-2 under the Exchange Act

73.     The Commission repeats and realleges paragraphs 1 through 49 of this Complaint as if fully set forth herein.

74.     From at least November 2004 to March 2006, Pitters, directly or indirectly, made or caused to be made materially false or misleading statements or omitted to state, or caused another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such

statements were made, not misleading, to an accountant in connection with an audit, review, or examination of VoIP's financial statements or the filing of reports required to be filed with the Commission.

75. By reason of the foregoing, Pitters violated Rule 13b2-2 under the Exchange Act, 17 C.F.R. § 240.13b2-2.

## COUNT VIII

### Ivester and Pitters Violated Rule 13a-14 Under the Exchange Act

76. The Commission repeats and realleges paragraphs 1 through 49 of this Complaint as if fully set forth herein.

77. Between November 2004 and May 2005, in an annual report filed on Form 10-K and quarterly reports filed on Forms 10-Q, Ivester and Pitters falsely certified that to the best of their knowledge there was no untrue statement of material fact or omission of a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

78. By reason of the foregoing, Ivester and Pitters violated Rule 13a-14 under the Exchange Act, 17 C.F.R. § 240.13a-14.

## COUNT IX

### Ivester Violated Section 16(a) of the Exchange and Rule 16a-3

79. The Commission repeats and realleges paragraphs 1 through 53 of this Complaint as if fully set forth herein.

80. Between April 2004 and December 2005, Ivester, who was an officer and director of VoIP, and a principal shareholder who owned more than 10% of a registered class of equity securities of VoIP, failed to file reports with the Commission disclosing

his ownership interests in VoIP securities and changes of ownership interests in those securities in accordance with Section 16(a) of the Exchange Act, 15 U.S.C. § 78p(a), and Rule 16a-3 thereunder, 17 CF.R. § 240.16a-3.

81.     By reason of the foregoing, Ivester violated Section 16(a) of the Exchange Act, 15 U.S.C. § 78p(a), and Rule 16a-3 thereunder, 17 CF.R. § 240.16a-3.

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

### Declaratory Relief

Declare, determine, and find that Pitters, Kuykendall, and Ivester have committed the violations of the federal securities laws alleged in this Complaint.

### II.

### Permanent Injunctive Relief

Issue a Permanent Injunction enjoining:

(A)     Pitters from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 13(b)(5) of the Exchange Act, 15 U.S.C. §§78j(b), 78m(a), 78m(b)(2)(A), 78m(b)(2)(B), and §78m(b)(5), and Rules 10b-5, 12b-20, 13a-1, 13a-13, 13a-14, 13b2-1, and 13b2-2 thereunder, 17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-13, 240.13a-14, 240.13b2-1 and 240.13b2-2;

(B)     Kuykendall from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 13(b)(5) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), 78m(b)(2)(B), and §78m(b)(5), and

Rules 10b-5, 12b-20, 13a-1, 13a-13, and 13b2-1 thereunder, 17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-13, and 240.13b2-1; and

(C)     Ivester from violating Section 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(2) and (3), and Section 16(a) of the Exchange Act,15 U.S.C. § 78p(a), and Rules 13a-14 and 16a-3 thereunder, 17 C.F.R. §§ 240.13a-14 and 240.16a-3.

## III.

### Disgorgement with Prejudgment Interest

Issue an Order directing Pitters, Kuykendall, and Ivester to each disgorge all profits or proceeds they received as a result of the acts and/or courses of conduct complained of herein, with prejudgment interest.

## IV.

### Civil Money Penalties

Issue an Order directing Pitters, Kuykendall, and Ivester to each pay a civil money penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

## V.

### Officer and Director Bar

Issue an Order permanently barring Pitters from acting as an officer or director of a publicly-held company pursuant to Section 21(d)(2) of the Exchange Act, 5 U.S.C. § 78u(d)(2).

## VI.

### Further Relief

Grant such other relief as the Court may deem just and appropriate.

## VII.

### Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Respectfully submitted,

April 13, 2009                    By: _____

C. Ian Anderson
Senior Trial Counsel
New York Reg. No. 2693067
Direct Dial: (305) 982-6317
E-mail: andersonci@sec.gov
*Lead Counsel*

Attorney for Plaintiff
**SECURITIES AND EXCHANGE
COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile:  (305) 536-4154

%JS 44   (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION | OSVALDO PITTERS, TERRELL J. KUYKENDALL, and STEVEN M. IVESTER |

**(b)** County of Residence of First Listed Plaintiff _____ (EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant **BROWARD** (IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
C. Ian Anderson, Esq.
Securities and Exchange Commission
801 Brickell Avenue, Suite 1800
Miami, FL 33131
(305)982-6317 09-Cv-20957 —Graham /Torres

Attorneys (If Known)

FILED by ATS D.C.

APR 13 2009

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. of FLA. – MIAMI

**(d)** Check County Where Action Arose:  ☒ MIAMI-DADE  ☐ MONROE  ☐ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE  ☐ HIGHLANDS

| II. BASIS OF JURISDICTION (Place an "X" in One Box Only) | III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff (For Diversity Cases Only) and One Box for Defendant) |
|---|---|

☒ 1  U.S. Government Plaintiff
☐ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Re-filed- (see VI below)   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

| VI. RELATED/RE-FILED CASE(S). | (See instructions second page): | a) Re-filed Case ☐ YES ☐ NO | b) Related Cases ☐ YES ☐ NO |
|---|---|---|---|
| | | JUDGE | DOCKET NUMBER |

**VII. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity): 15 U.S.C. §77a(a), 78j(b), 78m(a), 78m(b)(2)(A), 78m(b)(2)(B), and 78(b)(5); 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13, 240.13b2-1 and 240.13b2-2. VIOLATIONS OF FEDERAL SECURITIES LAWS
LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

| VIII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ | CHECK YES only if demanded in complaint: JURY DEMAND: ☐ Yes ☒ No |
|---|---|---|---|

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE 04/13/2009

FOR OFFICE USE ONLY

AMOUNT _Waived_   RECEIPT # _____   IFP _____